1             **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF MICHIGAN**
2               **SOUTHERN DIVISION**

3   **THE UNITED STATES OF AMERICA,**

4              Plaintiff,        **Case No. 11-20129**

     **-v-**
5

6   **VINCENT WITORT, D-8,**

             Defendant.
7   _____/

8            **MOTION AND EVIDENTIARY HEARING**

9         BEFORE THE HONORABLE **ROBERT H. CLELAND**
           United States District Judge
10      Theodore Levin United States Courthouse
        231 West Lafayette Boulevard
11           Detroit, Michigan
          **April 11, 2014**
12

13   **APPEARANCES:**

14   FOR THE PLAINTIFF:   SAIMA MOHSIN
                  JEROME MAIATICO
15                  U.S. Attorney's Office
                 211 W. Fort Street
16                  Suite 2000
                 Detroit, MI 48226

17   FOR THE DEFENDANT:   KIMBERLY W. STOUT
                 Kimberly W. Stout, PC
18                  370 East Maple Road
                 Floor 3
19                  Birmingham, MI 48009

20

21        **To Obtain a Certified Transcript Contact:**
  Christin E. Russell, RMR, CRR, FCRR, CSR - (248) 420-2720
22      Proceedings produced by mechanical stenography.
   Transcript produced by computer-aided Transcription.
23

24

25

1                           <u>TABLE OF CONTENTS</u>

2

3        <u>Evidentiary Hearing</u>                             <u>Page</u>

4        <u>WITNESSES FOR THE DEFENDANT:</u>

5        **JACOB WITORT**

6        DIRECT EXAMINATION BY MS. STOUT           5

7        CROSS-EXAMINATION BY MR. MAIATICO       16

8

9        **PAUL WITORT**

10       DIRECT EXAMINATION BY MS. STOUT         20

11       CROSS-EXAMINATION BY MR. MAIATICO     33

12       REDIRECT EXAMINATION BY MS. STOUT     41

13

14

15       Argument by Ms. Stout               44

16       Argument by Mr. Maiatico           50

17       Ruling of The Court               56

18

19       <u>Exhibits:</u>

20       DX A        (Marked for identification)    28

21       DX B        (Marked for identification)    30

22

23

24

25       CERTIFICATE OF REPORTER            66

1  Detroit, Michigan

2  April 11, 2014

3  10:06 a.m.

4                    *              *              *

5       (Call to Order of the Court; all parties present.)

6           THE CLERK:  Calling case No. 11-20129, the United

7  States of America vs. Vincent John Witort.

8              Counsel, please state your appearances for the record.

9           MR. MAIATICO:  Good morning, your Honor.  Jerome

10  Maiatico on behalf of the Government, and joined at counsel

11  table by Saima Mohsin.

12           THE COURT:  Good morning.

13           MS. MOHSIN:  Good morning.

14           MS. STOUT:  Good morning, your Honor.  Kimberly Stout

15  on behalf of Vincent Witort, who is sitting at -- seated at the

16  table.

17           THE COURT:  Very good.  You have a motion, Ms. Stout,

18  seeking to reopen the question of detention and to revoke the

19  detention order.

20           MS. STOUT:  Your Honor, that's correct.  I filed a

21  motion to dismiss based on due process and speedy trial, and/or

22  in the alternative, a motion to revoke the detention order.

23  This would be a first review of the magistrate in California's

24  order of detention.

25              THE COURT:  I look at these things as equivalent to a

1   motion for reconsideration.  I look for indications of new and

2   different evidence, indications of things that had not been

3   considered previously and matters, or perhaps matters that were

4   presented that in which circumstances have changed or the

5   evidence appears to be absent now that was presented earlier,

6   that may have perhaps misled the other judicial officer into a

7   finding of detention that needs to be reconsidered in the light

8   of additional new and different evidence.

9           So whatever you'd like to present, you may.

10          MS. STOUT:  Thank you, your Honor.  I recognize that

11  there's not necessarily a *de novo* standard, and I appreciate

12  you letting me know that.

13          I would like to say, though, I do have two witnesses,

14  Mr. Witort's son and Mr. Witort's brother.  They will be brief.

15  The information that everyone has provided upon review of the

16  transcript has not been provided before through any testimony.

17          And also, we've had some opportunity to review some

18  discovery, so that information wasn't available either.  So

19  hopefully, if I'm going into something you want me to stop,

20  please let me know.

21          Thank you, your Honor.  The defense would first call

22  Mr. Jacob Witort.

23          (Witness is sworn.)

24          THE COURT:  You can have a seat, sir.

25                      JACOB WITORT

JACOB WITORT - DIRECT

```
 1       called as a witness at 10:09 a.m., testified as follows:
 2                         DIRECT EXAMINATION
 3    BY MS. STOUT:
 4    Q.  Could you state your name for the record.
 5    A.  Jacob Witort.
 6    Q.  And do you know this gentleman seated at the table?
 7    A.  Yes.  That's my father.
 8    Q.  And the man, how is he clothed?
 9    A.  In red clothes.
10    Q.  Thank you.  How old are you, Mr. Witort?
11    A.  I am 34 years old.
12    Q.  Where were you born?
13    A.  Whittier, California.
14    Q.  Where were you raised?
15    A.  In Bloomington, California.
16    Q.  At a specific address or?
17    A.  19009 Santa Ana.
18    Q.  And what's the description of that property?
19    A.  It was a ranch house.
20    Q.  Does it have acreage?
21    A.  Yeah.  It had 5 acres.
22    Q.  Do you have siblings?
23    A.  Yes.  I have a brother.
24    Q.  What's his name?
25    A.  Michael Witort.
```

JACOB WITORT - DIRECT

1  Q.  And how old is he?

2  A.  Thirty-one.

3  Q.  Any other siblings?

4  A.  No.

5  Q.  And were your parents married at that location?

6  A.  Yes.

7  Q.  But not at -- they were married --

8  A.  They were married.

9  Q.  -- at the time they lived there?

10  A.  At that location.  Yeah, they were.

11          THE COURT:  One person at a time.

12          MS. STOUT:  I'm sorry, your Honor.

13          THE COURT:  Go ahead.

14  BY MS. STOUT:

15  Q.  They were married at the time?

16  A.  Yes.

17  Q.  Are they still married?

18  A.  Yes.

19  Q.  Do you know how many years?  If you know.

20  A.  Twenty-eight, 29 years.

21  Q.  How would you describe your upbringing?

22  A.  Happy, loving, caring.

23  Q.  What did your dad do for a living?

24  A.  He had a spa business.  He got blemished and damaged spas

25  from the manufacturer, fixed them and then sold them.

JACOB WITORT - DIRECT

1   Q.  Did he have any other skills?

2   A.  He was a mechanic.  He did construction.

3   Q.  Did he exercise those skills, fix cars or anything like

4   that, as well?

5   A.  Yes.

6   Q.  Did he teach you any of those skills?

7   A.  Yes.  He taught me a lot of construction skills.

8   Q.  Did you do any work with him?

9   A.  Yes, I did.

10  Q.  Can you give me an example?

11  A.  Me and my dad did a remodel at my uncle Paul's house up in

12  Portland, and then another one in Half Moon Bay.

13  Q.  And how long would you stay on these projects?

14  A.  I was there about two months on each one.  My dad was there

15  longer.

16  Q.  Did your uncle pay for that service?

17  A.  Yes.

18  Q.  Did your mom work?

19  A.  No.  She was a house mom.

20  Q.  Stay-at-home mom?

21        What kind of activities were you and your brother

22  involved in as children?

23  A.  We rode motorcycles, we played baseball.  I played

24  football.  I wrestled.

25  Q.  Did you have any animals on the 5 acres?

JACOB WITORT - DIRECT

1    A.   Yes.  We had a horse, some dogs.

2    Q.   Are you familiar with a club by the name of Devils

3    Diciples?

4    A.   Yes.

5    Q.   And what do you know about the Devils Diciples, if

6    anything?

7    A.   It's a club, motorcycle club.  That's all I know.

8    Q.   Do you know if your dad is part of that?

9    A.   He was a member.

10   Q.   Did you ever meet any other members?

11   A.   Yes.

12   Q.   Do you recall anyone specifically?

13   A.   I met "Magoo", "Fat Dog."

14   Q.   And how did you happen to meet Magoo?

15   A.   He used to live with us.

16   Q.   Okay.  And why is that?

17   A.   Because he didn't have a place to live, and my dad was

18   helping him out and let him stay at our house.

19   Q.   In the house?

20   A.   No.  He had a trailer on the property.

21   Q.   On the property, okay.  And how did you happen to meet, I

22   think you called him "Fat Dog."  Do you know his real name?

23   A.   No, I don't.

24   Q.   How did you happen to meet Fat Dog?

25   A.   At the house.  Was --

1   Q.   What was he doing at the house?

2   A.   Just hanging out with my dad, playing darts, drinking

3   sodas.

4   Q.   Did he stay the night as well or was that just a visit for

5   the day?

6   A.   He'd stay the night sometimes.

7   Q.   How often?

8   A.   He'd come out once every couple years.

9   Q.   So not that often?

10   A.   No, not that often.

11   Q.   Okay.  But Mister, this gentleman named "Magoo" stayed on

12   the property for a temporary period?

13   A.   Yes.

14   Q.   Okay.  Did you ever go to a Devils Diciples clubhouse?

15   A.   Yes.

16   Q.   And where was that?

17   A.   Hollywood.

18   Q.   And what did you see and do when you were there?

19   A.   Drank a couple beers, ate food, just hung out and talked

20   with people.

21   Q.   Now, I imagine there came a time when you moved out of your

22   family's home?

23   A.   Yes.

24   Q.   Where do you reside now?

25   A.   Cayucos, California.

JACOB WITORT - DIRECT

1   Q.  Do you have a home there?

2   A.  Yes.

3   Q.  Are you married?

4   A.  No, I'm not.

5   Q.  Do you have, still have contact with your folks?

6   A.  Yes.

7   Q.  Your mother and father?

8   A.  Yes.

9   Q.  What do you -- did I ask you already, and forgive me, what

10  do you do for a living?

11  A.  I am a waiter at Taco Temple in Morro Bay, California.

12  Q.  And do you have any other employment?

13  A.  I'm also part owner of a motel in Cayucos, California.

14  Q.  Do you work at, then at both the taco place and the motel?

15  A.  Yes.  I do maintenance around the motel and any big lifting

16  or anything.

17  Q.  And how was it you were able to invest in that motel?

18  A.  With the inheritance we got from when my grandma died.

19  Q.  Was that your mother or father's mother?

20  A.  My mother's mother.

21  Q.  Did you -- excuse me.  While you were growing up, did you

22  see any weapons in the home on the ranch?

23  A.  The whole time I was there, I think I saw one gun one time.

24  Q.  Do you remember anything about that particular weapon?

25  A.  I just remember it was a handgun up in his closet.  That's

1   all I remember.

2   Q.  In your father's closet?

3   A.  Yes.

4   Q.  Did you ever see him carry it?

5   A.  No.

6   Q.  Does your father have any health issues?

7   A.  Yes, he does.

8   Q.  Could you tell us something about that?

9   A.  He had a heart attack in 2001.  He has gout.  He has

10  diabetes.

11  Q.  And you say he had a heart attack in 2001?

12  A.  Yes.

13  Q.  What condition, do you know the condition of his heart?  Is

14  he on medication?

15  A.  Yes.

16  Q.  Do you know anything about it?

17  A.  I know he's on medication.  I'm not sure what medication,

18  but.

19  Q.  And could you tell us a little bit about the gout?

20  A.  Well, I remember one time we went Christmas shopping at the

21  mall, and he could only walk around the mall for like seven,

22  maybe ten minutes and had to sit down.  And we had to go get

23  the car because his feet were killing him; he couldn't walk.

24  Q.  So you're saying due to pain?

25  A.  Yes.

1    Q.  And when what was that?

2    A.  I think in 2007.

3    Q.  And you said he has diabetes?

4    A.  Yes.

5    Q.  How long has he had that; do you know?

6    A.  He got diagnosed at around the same time the heart attack,

7    when he went, started going to the doctors.

8    Q.  So turn of the century?

9    A.  Yes.

10   Q.  2000.  Okay.  Is he insulin dependent?

11   A.  No.

12   Q.  Tell me about your mom's health.

13   A.  She's on antidepressants because she was really depressed

14   after her mom died in --

15   Q.  When, sir?

16   A.  2005.

17   Q.  And she became depressed?

18   A.  Yes.

19   Q.  And what's her condition today?

20   A.  She's still very depressed, still on the medication.

21   Q.  Has she had to do anything?

22   A.  Well, she had to move up with me, to come up and live with

23   me so she can get away from the area, because she felt like she

24   was all alone, she didn't have anyone down there.  I think she

25   wanted to be around her kids.

JACOB WITORT - DIRECT

1  Q.  So you're assisting your mother?

2  A.  Yes.

3  Q.  And your mother is in the courtroom, correct?

4  A.  Yes, she is.

5  Q.  Now, there came a time when your parents left that

6  property?

7  A.  Yes.

8  Q.  Called the ranch?

9  A.  Yes.

10  Q.  Is that correct?  Do you know about when that was?

11  A.  I think around 2005, when my grandma died.

12  Q.  Do you recall when you lived there through your childhood

13  and teenage years, did they own that property?

14  A.  No.

15  Q.  Do you recall sheriffs coming to the door?

16  A.  Yes.

17  Q.  And what was that about?

18  A.  Evictions.

19  Q.  How frequent was that?

20  A.  Maybe about twice a year.

21  Q.  And why was that; if you know?

22  A.  For not paying rent.

23  Q.  Did you have to leave at any time?

24  A.  Yes.

25  Q.  Where would you go?

JACOB WITORT - DIRECT

```
 1   A.   Usually to a motel.

 2   Q.   And who would go to the motel?

 3   A.   Me and my mom and my brother.

 4   Q.   And your father?

 5   A.   And my father.

 6   Q.   And would you return to the property then, square away, do

 7   you know?  Let me rephrase that, your Honor.

 8        Did you return to the property then after eviction?

 9   A.   Yeah.

10   Q.   So this was kind of a mode?

11   A.   Yes.

12   Q.   Evict, come back, evict, come back; is that accurate?

13   A.   Yes.

14   Q.   Did there come a time when your folks left the ranch?

15   A.   Yes.

16   Q.   Where do they live now?

17        Well, I know your father is now incarcerated, but

18   where did they live before he became incarcerated?

19   A.   He was in La Habra for a while.  And then towards the end,

20   he was staying up with me so he'd get the doctor care up in San

21   Luis Obispo County.

22   Q.   Doctor care for himself?

23   A.   Yes.

24   Q.   Okay.  Did that seem to assist your mother, when he was

25   around?
```

JACOB WITORT - DIRECT

1    A.   Yes.

2    Q.   Are you aware of any marital issues?  Was there fighting in

3    the home or abuse of any sort?

4    A.   No, no fighting.

5    Q.   Now, when they left the property, did someone else move in

6    or do you know anything, what happened to the property?

7    A.   One of my mom's good friends and her daughter were staying

8    at the property.  And after they moved out, they continued

9    paying the rent for two years on it, so Nicole could finish

10   high school.

11   Q.   Who continued to pay the rent?

12   A.   My mom and dad.

13   Q.   So that her good friend and her daughter could stay there?

14   A.   Yes.

15   Q.   And the young lady could finish high school?

16   A.   Yes.

17   Q.   Are you aware of your father doing -- abusing any drugs?

18   A.   No.

19   Q.   Have you seen methamphetamine on the property in the ranch?

20   A.   No.

21   Q.   Or in your dad's possession?

22   A.   No.

23   Q.   No to both?

24   A.   No to both.

25   Q.   When other -- when you met this gentleman named "Fat Dog"

1   and "Magoo," did you see them possessing methamphetamines?

2   A.  No.

3   Q.  Any other illegal drugs?

4   A.  No.

5           MS. STOUT:  Very well.  Thank you so much, sir.

6           THE COURT:  Any additional exam?  Go ahead.

7                     CROSS-EXAMINATION

8   BY MR. MAIATICO:

9   Q.  Yes.  Good morning.

10          Sir, you said that you are aware that your father is a

11  member of the Devils Diciples?

12  A.  Yes.

13  Q.  As far as you know, how long had he been a member of the

14  Devils Diciples Motorcycle Club?

15  A.  Most of my life.

16  Q.  Okay.  And you said you were 34 years old?

17  A.  Yes.

18  Q.  Have you ever seen your father -- or are you familiar with

19  the Devils Diciples Motorcycle Club and the vests and the

20  patches that the members wear?

21  A.  I've seen them, but I'm --

22  Q.  Have you seen your father wear those, wear a vest?

23  A.  Yeah.

24  Q.  Now, you said you grew up on a ranch.  Was this known as

25  the "Holiday Spa Ranch" to some people?

1  A.  Yes.

2  Q.  What is the Holiday Spa Ranch?

3  A.  Holiday, that was his business, Holiday Customs Spas, so

4  Holiday Spa Ranch was.

5  Q.  So you're aware that your father went by the nickname

6  "Holiday"?

7  A.  Yes.

8  Q.  Did you ever call him that?

9  A.  No.

10  Q.  Did other members of the Devils Diciples call him that?

11  A.  Yes.

12  Q.  Have you, yourself, ever been associated with a motorcycle

13  club?

14  A.  No.

15  Q.  You're not a member of the Devils Diciples?

16  A.  No, I'm not.

17  Q.  You spoke a little bit about your father's spa business and

18  also that he did some odd jobs as a mechanic --

19  A.  Uh-huh.

20  Q.  -- and such.  Did he ever stop working at some point?

21  A.  Well, yeah.  There was times that he wasn't working, when

22  spas weren't selling.

23  Q.  And you mentioned that he had a heart attack, he had

24  diabetes.  Was there ever a time when, you know, he stopped

25  working because of those issues?

1   A.  Yeah.  That was why he couldn't work, the start of it, part

2   of it.

3   Q.  Has he been employed in the last ten years?

4   A.  No.  No.

5   Q.  Your answer is no?

6   A.  No.

7   Q.  Okay.  Now, you talked about going to some clubhouses, or

8   at least the clubhouse in Hollywood.

9   A.  Ah-huh.

10  Q.  Did you go there with your father?

11  A.  Yes.

12  Q.  And that was a Devils Diciples clubhouse?

13  A.  Yes.

14  Q.  You said you drank some beers there?

15  A.  Yes.

16  Q.  Did you see your father drink beers, as well?

17  A.  Yeah.

18  Q.  Have you ever seen your father drink beer?

19  A.  I think maybe about five times my whole life I've seen him

20  drink.

21  Q.  When you were at these events at the clubhouse or

22  associating with other Devils Diciples members, you said you

23  never saw them with drugs.  Have you ever heard them talk about

24  drugs?

25  A.  No.

JACOB WITORT - CROSS

1    Q.   Methamphetamine?

2    A.   No.

3    Q.   Marijuana?

4    A.   I've seen someone smoke marijuana before.

5    Q.   Who have you seen smoke marijuana?

6    A.   I've seen my dad once and other members, but.

7    Q.   And when was that, when you saw your father smoke

8    marijuana?

9    A.   Maybe ten years ago or so.

10   Q.   And you saw other members of the Devils Diciples smoke

11   marijuana, as well?

12   A.   Well, I think it was like a cigarette rolled up.  I didn't

13   know if it was a cigarette or a joint or, because I wasn't

14   right around.  I just seen people in a corner smoking.

15   Q.   Okay.  And you saw and smelled the marijuana?

16   A.   Yeah.

17   Q.   Do you know where they got that marijuana from?

18   A.   No.

19   Q.   You also mentioned that your father owned a handgun, or at

20   least there was a handgun that was in your father's closet.

21   A.   Uh-huh.

22   Q.   I just want to clarify, was that your father's handgun?

23   Was that a handgun he owned?

24   A.   I think so, yes.

25   Q.   Are you aware that your father has been charged with drug

1   trafficking in this case?

2   A.  Yes.

3   Q.  Are you also aware that he's been charged with the

4   attempted murder of other Devils Diciples members in this case?

5   A.  Yes.

6           MR. MAIATICO:  No further questions.

7           THE COURT:  Ms. Stout, anything else?

8           You can step down.

9           (Witness excused, 10:24 a.m.)

10          THE COURT:  Next?

11          MS. STOUT:  The defense calls Mr. Paul Witort.

12          (Witness is sworn.)

13          THE COURT:  Have a seat.

14                          PAUL WITORT

15    called as a witness at 10:24 a.m., testified as follows:

16                      DIRECT EXAMINATION

17  BY MS. STOUT:

18  Q.  Good morning, sir.  Could you state your name for the

19  record?

20  A.  Paul Witort.

21  Q.  And, sir, how are you related to Mr. Vincent Witort?

22  A.  I'm one of his older brothers.

23  Q.  Do you recognize him here in the courtroom?

24  A.  Yes.

25  Q.  What is he wearing?

PAUL WITORT - DIRECT

1    A.   He's got the maroon shirt.

2    Q.   Thank you.  You were raised with Mr. Witort, Vincent?

3    A.   Right.  It was primarily in the Libertyville, Illinois.

4    And it was probably almost his whole life, and you know, I was

5    there from first grade till college.

6    Q.   How many siblings are there?

7    A.   Six brothers and sisters.

8    Q.   And could you give their names and what they do for a

9    living?

10   A.   The oldest is Joan, and has been a registered nurse for 40

11   years, in different nursing roles and most recently as a school

12   nurse.

13          My brother Michael, who worked in the data processing

14   for a bank, and more lately is into holistic health market.

15   Myself, sister --

16   Q.   What do you do, sir?

17   A.   My main career was in engineering management.  I worked for

18   Hewlett-Packard for 17 years, and then several other companies

19   including Apple and 3Com, and others for three years or, or

20   less.

21   Q.   So you are a licensed engineer?

22   A.   Not a professional engineer, but I have an engineering

23   undergraduate and a Master's in engineering.

24   Q.   And where are those degrees from?

25   A.   The undergraduate degree is University of Illinois, Urbana

 1   campus, and the Master's degree is from Columbia University.  I

 2   also have a business degree.

 3   Q.  And where is that from?

 4   A.  That's from Harvard.

 5   Q.  From Harvard, okay.

 6        So you said there was Joan, Michael and yourself.  And

 7   who is next?

 8   A.  Ellen, who has been in project management for quite a

 9   number of years.  She does interest group studies, professional

10   job.

11   Q.  Okay.  And who is next?

12   A.  That would be, that would be Vince.

13   Q.  Okay.

14   A.  And then there is Stephen.

15   Q.  And what does Stephen do?

16   A.  Stephen has a law degree, business and law degree, worked

17   for 3-M, more recently as a lobbyist in, in Washington.

18   Q.  And who is the baby?

19   A.  That would be Mary.  And she's been a professional project

20   manager for a number of telecommunications firms for 30 years.

21   And now she's working for a non-profit Christian organization

22   as a project manager.

23   Q.  Thank you.  Are you married?

24   A.  I'm married.

25   Q.  Children?

PAUL WITORT - DIRECT

```
1    A.  Three.

2    Q.  Grown?

3    A.  All, all three.

4    Q.  Where do you reside, sir?

5    A.  Our official address is 1380 NW 95th in Portland, Oregon.

6    We're spending time now down in Berkeley, California.

7             (Brief pause.)

8    Q.  You can take a minute.  There's some water next to you, and

9    there's some Kleenex.

10   A.  Wasn't expecting this.  Excuse me.

11   Q.  Are you okay to continue?

12   A.  Yeah, I'm okay.

13   Q.  So you have two homes?

14   A.  So we're in Berkeley because of a family medical issue.

15   Q.  So you have two places that you can reside?

16   A.  Pardon me?

17   Q.  You have two places that you can reside?

18   A.  Correct.

19   Q.  Are you aware what your brother, Vincent, does for a living

20   or did for a living?

21   A.  Yes.

22   Q.  What is that?

23   A.  A spa business and construction work.  Spa business was

24   probably at the longest, you know, consistent effort.

25   Q.  And what do you mean by spa business?
```

1   A.   He repaired blemished spas from Sundance Spa Company.   He

2   got units that were new that had blemishes.   He fixed them.   He

3   resold them with the blessing of the company.

4   Q.   Okay.   And where did he do that?

5   A.   At his ranch in Fontana, Bloomington, California.

6   Q.   You heard the testimony of Jacob, your nephew?

7   A.   Yes.

8   Q.   Would that be the same ranch you're referring to?

9   A.   Correct.

10  Q.   And have you ever been to that ranch?

11  A.   I've been to there several times.

12  Q.   Did you see Mr. Witort at work?

13  A.   Yes.

14  Q.   Okay.   And are you -- you said he's also in construction.

15  Are you familiar with that?

16  A.   Very.

17  Q.   How is it you're familiar with that?

18  A.   I worked closely with him on a number of projects, on

19  property that we had or extensions to the house, additions,

20  whatnot, probably on four or five occasions in the last 15

21  years.

22  Q.   Did he stay with you during those times?

23  A.   He stayed, yeah.   And often we were, you know, quite close.

24  There may have been a small motor home that we lived in for

25  five weeks together working on one of the properties that was,

PAUL WITORT - DIRECT

1   you know, remote from where I lived.

2   Q.  Did you see him ingest any illegal substances?

3   A.  Never.

4   Q.  Did you see him carrying a weapon?

5   A.  Never.

6   Q.  Did you see weapons or -- weapons on this ranch you

7   referred to?

8   A.  No, never.

9   Q.  Did you see illegal substances?

10  A.  Never.

11  Q.  Are you familiar with an organization called the Devils

12  Diciples?

13  A.  I'm aware of it.

14  Q.  What do you know about them, if anything?

15  A.  It was a motorcycle club; that he was a member of it.

16  That's --

17  Q.  Did Mr. Witort leave the Illinois family home at an early

18  age and go -- where did he -- how did he transcend into an

19  adult?

20  A.  You know, he went, he went west, you know, after, after

21  high school.  I think he might have been a semester or two in

22  Northern Illinois University, I vaguely recollect.

23  Q.  And that was the '60s, right?  The era of the Vietnam War?

24  A.  Yeah, late '60s, probably late '60s.

25  Q.  So there was a lot of movements at the time, and people

PAUL WITORT - DIRECT

1   were going west; is that accurate?

2   A.   Right.   It was, there was some unsettling things going on

3   in our family, and you know, there was --

4   Q.   Okay.

5   A.   -- uncertainty of what the --

6   Q.   Your mother had a health issue; is that correct?

7   A.   My mother did, yeah.   My mother was bipolar and wasn't --

8   Q.   They didn't diagnose it back then as bipolar, correct?

9   A.   Correct.

10  Q.   Okay.   And your brother is also bipolar also, Michael; is

11  that correct?

12          MS. STOUT:   I'm sorry, to lead, your Honor.   The

13  witness is having --

14          THE COURT:   I'm sorry.

15          MS. STOUT:   If I lead a little bit, is that all right,

16  your Honor?   Just because he's having difficulty answering?

17          THE COURT:   Yes, that's fine.

18          MS. STOUT:   Thank you.

19  BY MS. STOUT:

20  Q.   Are you familiar with any of his friends in the Devils

21  Diciples?

22  A.   Not on a familiar basis.   I've chatted briefly with a

23  couple of them.   I kind of remember their names.

24  Q.   Okay.

25  A.   There may be one I remember a name.

PAUL WITORT - DIRECT

1   Q.   Okay.  And was that when you were in California, that you

2   chatted with those people?

3   A.   That I what with those people?

4   Q.   Was that when you were in California, that you chatted with

5   those members?

6   A.   Yeah.  If there was -- I can't remember a specific one, but

7   I remember seeing, seeing some.

8   Q.   Okay.  Did you ever go to his -- any of the clubhouses?

9   A.   No.

10  Q.   Now, let's turn to more recently.  Are you aware of your

11  brother's health conditions?

12  A.   Yes.

13  Q.   And what are those?

14  A.   Heart attack, diabetes, cataracts.  I read gout somewhere,

15  but I haven't --

16  Q.   Okay.  You're not familiar with the gout.  You read it.

17  All right.

18  A.   I'm not a doctor, but.

19  Q.   How about his wife, Sharon?

20  A.   She suffers from, from depression.  And it's been discussed

21  a number of times over the years.  And it was why, since about

22  2005, he hasn't been able to come up and, you know, participate

23  in construction projects.

24        That's, you know, initially that's not the reason he

25  gave, but when, you know, I just can't come, I've got things

1   I'm responsible for here.

2           And then later when, you know, pressed him on it

3   because it was unusual he wouldn't come up, he's always came up

4   in the past.  So we found out the situation with his wife, and

5   it's been exasperated by his detention now.

6   Q.  And you're close to your brother, Vincent?

7   A.  I would say very.

8   Q.  I'm going to show you a package of documents that --

9           MS. STOUT:  Your Honor, should I ask the court

10  reporter to mark this?

11          THE COURT:  You mark your own.

12          MS. STOUT:  I'm sorry?

13          THE COURT:  You mark your own exhibits.

14          MS. STOUT:  Okay.  Thank you.  Can I approach the

15  witness?

16          THE COURT:  Yes, you may.

17  BY MS. STOUT:

18  Q.  Can you describe what I just handed you?

19  A.  These are records from the Fontana court that I requested

20  some months ago, and that I had sent onto you the original

21  copies from the court.

22  Q.  And can you describe what they concern, what they are

23  about?

24  A.  These are on, I believe the term is unlawful detainer

25  reports that were, or cases that indicated when the landlord

1   took legal means to, to get the rent.

2   Q.  Is that similar to eviction notices?

3   A.  I expect so.

4   Q.  And when -- and this was at the ranch property?

5   A.  These were all at the ranch property, 19009 Santa Ana in

6   Bloomington, California.

7   Q.  And the lawsuits were against Mr. and Mrs. Witort?

8   A.  Probably both, sometimes Holiday, sometimes Sharon Witort,

9   sometimes Vince Witort.

10  Q.  Different names?

11  A.  Same person.

12  Q.  And when did -- what period of time do these records cover?

13  A.  Well, these particular ones, I believe, started in 1988 and

14  continued through the early 2000s, maybe 2004, 2005.  I'd have

15  to look at the last one.  And this wasn't all of it.  This was

16  came from a particular database that they had, but I believe

17  there was about 30 of them.  Each one is an unlawful detainer.

18  Q.  Thank you.  And was he aware that he was being repeatedly

19  evicted?

20  A.  Yes.

21  Q.  Did you try to assist him in any way?

22  A.  Yeah.  I would usually find out because he would want to

23  borrow some money to put together, you know, often five to

24  $8,000 that was needed to pay the past six months' rent.  This

25  often, this happened almost twice a year, pretty predictably.

1   Q.  And did you help him?

2   A.  Often.

3   Q.  Did he pay you back?

4   A.  He did, by coming, often by coming back and working for

5   some number of weeks or months.

6   Q.  He paid you in trade?

7   A.  I would say much more often, yes, I think that was, that

8   was the typical arrangement.

9   Q.  With construction work?

10  A.  Correct.

11  Q.  Okay.  Thank you.

12          MS. STOUT:  Can I approach, your Honor?

13          THE COURT:  Yes.

14          MS. STOUT:  Thank you.

15  BY MS. STOUT:

16  Q.  Can you identify what's been marked as exhibit --

17  Defendant's Exhibit B?

18  A.  I'm sorry, what was the question?

19  Q.  You have a hearing aid, right?

20  A.  Yes, I do.

21  Q.  Sorry.  Can you identify what has been marked Defendant's

22  Exhibit B?

23  A.  Agreement to assume custody of the defendant.

24  Q.  Did you execute that document?

25  A.  Yes.

PAUL WITORT - DIRECT

```
 1   Q.   And does that document indicate that you would be willing
 2   to be the third-party custodian, should this Court revoke the
 3   detention order of your brother, Mr. Witort?
 4   A.   Yes.
 5   Q.   And does it indicate that you would live in Berkeley,
 6   California?
 7   A.   That's our current, current residence, right.
 8   Q.   With your wife?
 9   A.   Correct.
10   Q.   And Mr. Witort, and if his wife chooses, Sharon also?
11   A.   Correct.
12   Q.   Do you have a bedroom for them?
13   A.   Yes, we do.
14   Q.   Would you be willing to allow him to be there on house
15   arrest with a tether?
16   A.   Absolutely.
17   Q.   Would you call Pretrial Services if you thought there were
18   any violations of the Court's order?
19   A.   Absolutely.
20   Q.   Would you be willing to escort him back to Michigan for his
21   August 29th trial date?
22   A.   Yes.
23   Q.   And how would you do that?  Would you fly?
24   A.   Probably.
25   Q.   And would you buy his ticket, if necessary?
```

PAUL WITORT - DIRECT

1   A.  That would be fine.

2   Q.  And what would you do once you got here?

3   A.  I would stay with him through the trial.

4   Q.  You would stay?  Would you stay in a hotel or look for a

5   rental?  Or what would you do?

6   A.  Whatever is appropriate.  Probably a short-term rental,

7   but.

8   Q.  Okay.

9   A.  You know.

10  Q.  And you could escort him to court every day?  You'd be

11  willing to do that?

12  A.  Yes.

13  Q.  Okay.  Is there any other things you're willing to do,

14  should this Court revoke a detention order?

15  A.  Well, I've, I've indicated that we'll put up one of our

16  houses, or the current house that we live in, which is, you

17  know, as bond.  Just as --

18  Q.  Is that house liened right now?

19  A.  Pardon me?  There are no liens on it.  We just bought this

20  house in Berkeley in December with loans from other houses, but

21  this house is free and clear.

22  Q.  And this house has a value today, fair market value of

23  what?

24  A.  Well, we bought it for $435,000 and we have improved it

25  since then.  So that would be a realistic bottom number.  It

1   was probably the cheapest house in Berkeley.

2   Q.  So you're willing to be both the third-party custodian and

3   lien your home, allow the Government to lien your home; is that

4   accurate?

5   A.  That's correct.

6           MS. STOUT:  Just one moment, please.

7           Thank you, very much, Mr. Witort.  Can you bring that

8   document down with you, when you come?  Oh, I'm sorry.  You're

9   going to be crossed.

10          MR. MAIATICO:  If I may, your Honor?

11          THE COURT:  There may be some additional questions,

12  sir.

13          THE WITNESS:  Thank you.

14          THE COURT:  Go ahead.

15          MR. MAIATICO:  Thank you.

16                          CROSS-EXAMINATION

17  BY MR. MAIATICO:

18  Q.  Mr. Witort, I just want to begin, you talked about going

19  places with your brother in a motor home over a period of time.

20          Who owned that motor home?

21  A.  Okay.  I owned the motor home.  And we used it to stay at,

22  at a property that we had in the mountains that was a rental.

23  And we couldn't live in the house because we were rehabbing it.

24  So we had a 20-year-old motor home that we stayed in.

25  Q.  And you talked about the Holiday Spa Ranch, or the ranch.

PAUL WITORT - CROSS

1   Do you know that -- do you call that the Holiday Spa Ranch as

2   well?

3   A.   The ranch.

4   Q.   Okay.   The ranch.   If you could, could you describe the

5   ranch a little bit for us?   How many buildings are on the

6   ranch?

7   A.   There's a, I don't know, roughly a three-bedroom, two bath,

8   a little bigger house, just regular style ranch house.

9   Nothing, there's nothing significant.

10          There's a garage off to the right, probably looked

11  like a two-car garage stacked with stuff for remodeling

12  kitchens and whatnot.

13          And then there were a number of, which look like kind

14  of chicken sheds, old, you know, wood-type structure, single

15  story that had machinery.

16  Q.   About how many of these sheds were on the property?

17  A.   I couldn't remember.   These are fairly big sheds.   You

18  know, we're talking 20, 30 feet across, and maybe 60, 80 feet

19  long, just roughly.   And there were probably at least several

20  of those.

21          And then the very back of the property, because it was

22  a number of acres, were some kind of junk cars, if you will.

23  Q.   Is it fair to say this is about a 5-acre property?

24  A.   That could be within reason, yeah.   I haven't measured it,

25  but you know.

PAUL WITORT - CROSS

1   Q.  Now, you said you had been there several times.  How many

2   times had you been there?

3   A.  I'm pretty sure of three times that I was there.  My mother

4   stayed there also for some number of days.

5   Q.  When you were there those three times, did you see the

6   entire property?  Did you go into each of those sheds?

7   A.  Each of the time, I got the grand tour.  I'm just, you

8   know, was interested, he wanted to show me.  And we were

9   looking for parts on some cars, so we got to see all the cars.

10  Q.  Were there any areas of that property that were off limits?

11  A.  None.  It's all pretty contiguous.  Those chicken sheds

12  were all right behind the house.

13  Q.  Now, you mentioned that you had gotten some eviction

14  records from the local courthouse that deal with the ranch

15  property.

16  A.  Correct.

17  Q.  Do you know who owned the property?

18  A.  I believe a person named Maldonado (phonetic).

19  Q.  In fact, on the, in the eviction notices that you had, you

20  had gotten from the courthouse, there's a Ramon Maldonado, an

21  A. Balderrama (phonetic) and a Fred Balderrama (phonetic).

22  Have you met either of those three individuals?

23  A.  I believe it's Ramon Maldonado who is the owner.  I never

24  -- tried to get in contact with him and/or just find out where

25  he lived or whatnot.  And he's -- the real estate records are

1   hard to follow.

2          The other person I believe might have been the lawyer

3   that he engaged to do the unlawful detainer.  That's -- there

4   was a name and it's vaguely right there.  But that name I don't

5   recognize like the Maldonado name.

6   Q.  During your visits, you never met either -- any of these

7   three people?

8   A.  No.  I didn't know their, their names until I, you know,

9   started asking about where their court records might be.

10  Q.  I know you said you visited the ranch several times.  You

11  also say in your letter to the Court that your brother lived

12  with you about four times over the last 15 years; is that

13  correct?

14  A.  Roughly, correct.

15  Q.  When was the last time that you had seen him before today?

16  A.  I believe that was plus or minus one year, in 2006.  2006

17  or 2007 when my, my son was married.  He came up for the

18  wedding and we stayed together in a rented house at the --

19  where the wedding was.

20  Q.  Let's, let's say over those past 15 years, or prior to

21  2006, 2007, what was your frequency of contact with him?  Did

22  you see him annually?

23  A.  My frequency of contact was probably weekly.  We spent a

24  lot of time on the phone together, because we have a lot of

25  common interests in construction.  And I would seek his advice

PAUL WITORT - CROSS

```
 1  on how to do certain things, even though he wasn't up there
 2  working.
 3         I would say, you know, some, it was probably three or
 4  four times, if you're talking about personal interaction, the
 5  three or four, excuse me, the three or four times with, you
 6  know, often it was for multiple months, or at least, you know,
 7  three or four, five weeks.
 8         There was a whole summer of 2001 probably four or five
 9  months.  And three or four months later, he was there for
10  another month and a half on, on something we were doing in
11  California.  So there was some, there was some lengthy stays in
12  there.
13  Q.  Okay.  And since 2006, I guess you hadn't -- you haven't
14  seen him for a lengthy period of time.  But between 2006 and
15  his arrest in this case, what was your frequency of contact,
16  just in terms of phone calls or letters?
17  A.  I would say roughly monthly, okay?  But it was -- we didn't
18  send letters.  It was all realtime.  It would have been on the
19  phone, you know, just kind of keep in contact with how things
20  are going.
21         I'm sorry.  I'm sorry.  There was -- there was a trip.
22  We took a trip down to through Cayucos and La Habra, roughly
23  two years ago.  I'm sorry, I don't have the -- I should have
24  that, but I don't have that right here.  My wife would know.
25  But we took a trip down through there.  And we spent two days,
```

1   we stayed at the La Habra house.  And we visited with Sharon

2   and Vince and on the loop that we went for two weeks.

3   Q.  You mentioned Sharon.  Are your brother and Sharon still

4   married?

5   A.  Oh, yeah.

6   Q.  Have they ever been separated?

7   A.  No.

8   Q.  That you're aware of?

9   A.  No.

10  Q.  You mentioned before that you're aware your brother was a

11  member of the Devils Diciples Motorcycle Club.  How long do you

12  know him to be a member for?  Do you know when he joined the

13  club?

14  A.  I don't know specifically.  But, you know, certainly I'd

15  have to tie it to an event where I remember I went down there,

16  but I would, you know, at least by the 1990s, he was, he was in

17  the club.  I don't know exactly when it started.

18  Q.  At least in the '90s, possibly in the '80s as well?

19  A.  I don't know the answer to that.  I know in the '70s, that

20  when we visited down there, he was not a member of the club.  I

21  remember that.

22  Q.  All right.  And have you ever seen him wear the, the

23  vestments of the club, including the patches or the leather

24  vest?

25  A.  I may have seen those.  And I don't ever think I remember

1  seeing him wear those.  He may have shown me them at some, at

2  some point, but I don't think it was something that I normally

3  saw him wear.

4  Q.  Now, are you aware that your brother has been charged with

5  drug trafficking in this case?

6  A.  I understand that.

7  Q.  Drug trafficking over the course of several decades?

8  A.  Two instances, I believe, in the indictment.

9  Q.  Okay.  And have you -- you've testified that you've never

10  seen him with drugs?

11  A.  I've never seen him with drugs.

12  Q.  You talked about some other members of the club who you're

13  not familiar with their names, but have you ever seen them with

14  drugs?

15  A.  We never saw any drugs by anybody when we were visiting the

16  ranch or other contact.

17  Q.  Has your brother or any of those members that you've had

18  contact with ever spoken about drug dealing, spoken about

19  methamphetamine or marijuana?

20  A.  No.

21  Q.  You're also aware that your brother has been charged with

22  attempted murder of other club members?  An incident in April

23  2003?

24  A.  I read that part of the indictment.  And it, it -- I don't

25  know that it talks about attempted murder, but okay.

1   Q.  Has he ever spoken to you about this incident, the April

2   2003 incident?

3   A.  No, not in any detailed way.  No.

4   Q.  You say not in any detailed way, but has he talked to you

5   about the incident?

6   A.  I think when the indictment came out, it was saying, well,

7   you got this charge, and he acknowledged that that was a

8   charge.  So that, it wasn't anymore detail than that.

9   Q.  Are you aware of the circumstances surrounding that, that

10  incident?

11  A.  I've read some of the media reports at the time.

12  Q.  One moment, please.

13        I'm sorry, just one more question.

14  A.  Sure.

15  Q.  We talked about the, the ranch.  Do you know what the rent

16  that your brother paid for that property was or can you give us

17  an estimate?

18  A.  I'm pretty sure it was -- I'll give my full recollection of

19  it.  Okay?  I'm pretty sure it was a thousand dollars a month,

20  which I thought was an incredible deal at the time.  I remember

21  that's why I'm thinking of it now.  And I don't think it

22  changed much over, you know, a decade or so.  So, you know, the

23  bill at the end of six months was often like $6,000, plus

24  expenses, you know, the lawyer expenses.  And that was, that

25  was the rent.  That was what Maldonado charged.

```
1              MR. MAIATICO:  All right.  I have no further
2    questions.  Thank you for your time, Mr. Witort.
3              THE WITNESS:  Thank you.
4              MS. STOUT:  Just briefly, your Honor, real briefly.
5              THE COURT:  Go ahead.
6                         REDIRECT EXAMINATION
7    BY MS. STOUT:
8    Q.  You and I have had discussions, correct?
9    A.  Yes.
10   Q.  And with regard to discovery, you're aware there's a
11   protective order; is that accurate?
12   A.  Correct.
13   Q.  And what does that mean?
14   A.  That means certain evidence or whatever can't be discussed
15   outside of, you know, the two of you.
16   Q.  So you wouldn't know of any of the evidence; is that
17   accurate?
18   A.  That's correct.  In fact, I've had many contacts with Vince
19   either, you know, with video contact more recently in the last
20   couple weeks, and e-mails and whatnot.  And, and, you know,
21   we're both careful to not mention that.  He mentions it a lot,
22   I mention it a lot.
23   Q.  And I do too, to you; is that accurate?
24   A.  Absolutely.
25   Q.  Okay.  And as far as Mr. and Mrs. Witort being separated,
```

```
 1   they were physically separated -- or are you aware if they were
 2   physically separated?
 3   A.  At which time?
 4   Q.  Or not?  Any time.
 5   A.  Yeah.  I mean, there, certainly for the last, last couple
 6   years they have been, but nobody maintains more contact than
 7   the two of those.  They talk daily on the phone.  Daily on the
 8   phone.
 9           MS. STOUT:  Thank you.  Thank you, very much, sir.
10   You can step down, I believe.
11           THE COURT:  I have a question.
12           MS. STOUT:  Oh, sorry.
13           THE WITNESS:  Pardon?
14           THE COURT:  I have a question.
15           THE WITNESS:  Oh.
16           THE COURT:  You say concerning this allegation of
17   assaultive behavior.  The allegation, as I read it in the
18   indictment, which is public, and as presumably it is displayed
19   in public documents that you say you've read.
20           THE WITNESS:  I've read the indictment.
21           THE COURT:  Media, media accounts.
22           THE WITNESS:  Oh.
23           THE COURT:  The allegations, as I understand them, are
24   that your brother and others transported a number of people out
25   into the desert, beat them with bats and other clubs and things
```

```
 1    of that sort, dumped their bodies into a ravine and left them
 2    for dead.  That's the essence of the allegation.  Do you
 3    understand that?
 4               THE WITNESS:  Okay.
 5               THE COURT:  Did you understand that to be the nature
 6    of the allegations from the media reports that you've read?
 7               THE WITNESS:  To be honest, I don't recall mention of
 8    bats --
 9               THE COURT:  Okay.
10               THE WITNESS:  -- in the indictment.
11               THE COURT:  Okay.
12               THE WITNESS:  But I think there was some mention of
13    ravine or something.
14               THE COURT:  Eliminate the bat part of it then.
15               THE WITNESS:  Okay.
16               THE COURT:  Does that sound like the set of
17    allegations that you --
18               THE WITNESS:  Substantially, yes.
19               THE COURT:  Okay.  Now, I would venture to say that
20    that is an inflammatory set of allegations.  Do you agree with
21    that?
22               THE WITNESS:  I would say so, yeah.
23               THE COURT:  Okay.
24               THE WITNESS:  I would agree.
25               THE COURT:  My impression of your answers concerning
```

```
 1    your interaction with the defendant is that you've never really
 2    discussed any of that, any of those details or the allegations
 3    or anything with him, basically at all.  Is that the impression
 4    that you were endeavoring to leave?
 5              THE WITNESS:  That, that is the case, your Honor.
 6              THE COURT:  That is the case.  All right.  Thank you.
 7    I have no other questions.
 8              Do either counsel have any additional questions based
 9    on anything the Court asked?
10              MS. STOUT:  No, your Honor.  Thank you.
11              MR. MAIATICO:  Nothing from the Government, your
12    Honor.
13              THE COURT:  You may step down.  Thank you.
14              (Witness excused, 10:56 a.m.)
15              THE COURT:  Ms. Stout, you've had extensive
16    evidentiary presentation here, and I think that I understand
17    the import of it.  What is your argument, please?  Is there
18    something new and different here that's been -- that it was not
19    available to be presented to the magistrate judge, for example?
20              MS. STOUT:  There was no testimony taken.  Everything
21    was by proffer before the magistrate.  And we now have actual
22    evidence of various health issues and of his background.
23              THE COURT:  Weren't health issues noted by the
24    magistrate?
25              MS. STOUT:  They were noted.  That's not the real push
```

```
 1    of, of my request anyways, your Honor.  That's just noted.
 2             THE COURT:  Okay.
 3             MS. STOUT:  There, in terms of new evidence, your
 4    Honor, I can, because I don't know if I am permitted to discuss
 5    any discovery in open court, quite frankly, because there are
 6    other people present and there's a protective order.
 7             THE COURT:  Okay.
 8             MS. STOUT:  So I was going to refer to a couple
 9    documents that were within the evidence that I've reviewed.
10    May I proceed?
11             THE COURT:  I don't have a view in that regard.  Have
12    you consulted with government counsel?
13             MS. STOUT:  Just one moment, your Honor.
14             (Brief pause.)
15             MS. STOUT:  The Government advised me that as long as
16    it's just for hearing purposes, to go forward.
17             So in terms of new things, your Honor, respect, with
18    respect to, and I'm sure one of the main concerns is
19    dangerousness to the community, particularly with respect to
20    the 2003 incident in Arizona which involved a beating of other
21    Devils Diciples who had apparently engaged in a despicable act,
22    and then there was what the Government refers to as vigilante
23    justice.  And there are allegations that my client was
24    apparently there, and allegations that my client was somewhat
25    of a leader in this incident.
```

```
 1              If discovery number 010321 is a document from the
 2    state of Arizona, County of Pima, it is a search warrant
 3    affidavit sworn out by an officer for a Lowell Schmick.  And on
 4    page 8 of 11 of that document it indicates that their
 5    confidential informant confirmed that -- confirms the assault
 6    that was previously mentioned underlying this whole incident
 7    against a woman, and stated that this Mister -- this is their
 8    confidential informant speaking -- this Mr. Schmick learned of
 9    that.  And that the CI stated that Schmick had contacted
10    members in Southern California and Michigan and made
11    arrangements to "clean house."  The CI stated at the time of
12    these incidents, Schmick was the vice president of the Tucson
13    club.
14              It also stated that -- it also states on page 9 that
15    as part of this affidavit, that Schmick and another member
16    drove these victims of the second assault out to Box Canyon,
17    and left them in a ravine.
18              I don't believe there's any allegations that my client
19    had any participation in it.  So it looks like this was
20    orchestrated by a man named Schmick.  And it looks like he's
21    the one that drove them out to a ravine, and as people
22    continually say, left them for dead.  And then he also, this CI
23    also had information that he participated in it.  So that is
24    some evidence, to put some parameters on it.
25              And to put further parameters on it, your Honor, I
```

1   think that we will hear testimony from people involved that

2   were there.  But the jury will be given the instruction, I

3   hope, Sixth Circuit pattern jury instruction 7.06(a), that says

4   use of informant testimony is permissible, but consider it with

5   more caution than other witnesses.  Have they been influenced,

6   in other words, as the Court well aware, what are they being

7   given for this.  Is it money?  No charges?  Less sentence?

8   Whatever it may be.

9          It says also in that instruction do not convict a

10  defendant based upon unsupported testimony of such a witness

11  standing alone unless you're really certain that you believe

12  beyond a reasonable doubt this happened.

13         So in other words, I don't think the evidence will

14  play out as, as it sounds on paper right now, as an allegation.

15  We don't know my client's actual role in terms, other than

16  what's been provided by people that are clearly benefitting

17  from, from testifying.

18         We don't know if he came with any intentions.  We

19  don't know if he committed any acts other than described by

20  potential confidential informants who are getting a benefit.

21         We do know, according to this affidavit, that he

22  wasn't a driver to the ravine.  We do know that State of

23  Arizona chose not to charge these gentlemen, for whatever

24  reason.  Not that that was necessarily relevant, I understand

25  that.

1          We do know that my client has no particular leadership

2     role in the club.  We know that "Fat Dog" is a national leader.

3     We do know that there's phone calls, and there's not

4     conversations around that time with "Fat Dog" and my client,

5     that would indicate any deep participation in planning this

6     horrific event.

7          We do know that at the time that this occurred, my

8     client had heart attacks, had gout, had kidney failure, was not

9     exactly a muscle man going to Power House ready to fight.  He

10    was a man that was in his 50's and not in the best of

11    condition.  So that's, that's the violence that specifically

12    applies to him.  We recognize this is a conspiracy and there's

13    other violence.

14         In terms of the drugs, your Honor, again, all the

15    evidence I've seen with respect to the drugs, other than

16    confidential informants and those people which Ms. Mohsin had

17    the courtesy to allow me to review some, and I won't really

18    speak of, other than those particular type of witnesses, we

19    don't have any searches of his home.  We have, instead, we have

20    sheriffs regularly going to his home and evicting him.  So we

21    don't have any evidence of any drug activity actually

22    occurring, hard evidence.

23         We're talking about a sale that's based on the

24    testimony of, of CI's from '94.  That's 20 years ago.  Also, a

25    "Person E" testified to something 12 years ago, in 2002.  To

1   blow that into a 30-year relationship with drugs and violence,

2   I think is a stretch.

3            I think that the evidence will be very limited with

4   respect to my client in this coming trial.  And that's why I'm

5   asking you to consider that there are safeguards that we can,

6   we can rebut the presumption of detention that he will not be a

7   danger to anybody or anything.  He's overweight.  He's older.

8   And I think you will see and learn in this trial, as I'm seeing

9   when I'm reviewing evidence that there was an older club and a

10  newer club.  And what the newer clubs do is -- newer members do

11  is certainly different than what the "old time hippies" might

12  have done.  So I'm asking the Court to consider all of that.

13           And we have a very fine gentleman, in my personal

14  opinion, who testified to being more than willing to take on

15  all kinds of responsibilities for his brother, because he feels

16  that strongly about it, including liening a very expensive

17  property, that took him a long time, I'm sure, to earn the

18  money to pay for.

19           So I think in view of that, we can fashion something

20  where he could be in his custody of his brother, who would get

21  everything approved by pretrial, be on a tether, take care of

22  any issues that he has with his house and be prepared for this

23  trial August 29th and be here.

24           And he has even said to me, your Honor, that if the

25  Court would rather him check in to Milan when he returns to

1    Michigan for trial, he will do that.  His brother has testified

2    he'll escort him here, buy the plane ticket, escort him here,

3    and any date the Court orders, and either stay in a rental or

4    check into Milan.

5           So I'm asking your Honor to consider all that I've

6    said, and that there are conditions that would assure his

7    reappearance and protect the community.

8           Thank you so much, your Honor.

9           THE COURT:  Yes, sir.

10          MR. MAIATICO:  Thank you, your Honor.

11          Your Honor, at the outset, I would just note that

12   there really is no new evidence that's being presented by the

13   defendant.  There was no objection to the proffer at the

14   initial detention hearing.  I think that is played out by the

15   record of the detention hearing, the transcript that your Honor

16   now has.

17          The evidence of the family ties, it's certainly

18   something that was available.  The defendant never asked for a

19   continuance of the detention hearing, but proceeded and never

20   objected.

21          Given that, your Honor, though, we're, whether there

22   is a reconsideration or a review by this Court, we are seeking

23   detention on both grounds, both that the defendant is an

24   unacceptable danger to the community and that he's a flight

25   risk.  Pretrial Services has also in their report asked for

 1   detention on both of those grounds.

 2         This is a presumption case, as defense counsel

 3   mentioned.  And this defendant is, in fact, one of the leaders

 4   of the Devils Diciples.  We have evidence that does show that.

 5   And it's also played out by the fact that of his significant

 6   involvement in large-scale drug trafficking and the acts of

 7   violence that defense counsel has talked about.

 8         I do want to mention this proposed third-party

 9   custodian, your Honor, because the family's presence here today

10   and the testimony of the brother and the son, I think, speaks

11   to, at least somewhat to the defendant's community and his

12   family ties.  It may have some bearing on the flight risk

13   assessment, but there's really no relevance to the defendant's

14   danger to the community when you're looking at these community

15   and family ties.

16         The brother testified that at least four times over

17   the last 15 years, his brother has actually lived with him in a

18   situation that was similar to what's being proposed as his

19   third-party custodian.  And the allegations in this case show

20   that during that same period, that's when this defendant is

21   alleged to have been involved in large-scale drug trafficking

22   and this act of violence in 2003.  So the presence of the

23   family ties has never assured the safety of the community in

24   the past.  And I submit to the Court that there's no reason to

25   think that it would now.

1          Just a few points in terms of the defendant's danger

2     to the community, the drug trafficking.  This defendant is not

3     just a street dealer, but it's alleged that he's a large-scale

4     national supplier.

5          One allegation in the indictment is that he directed

6     the transport of 3 pounds of methamphetamine.  To put that in

7     context for the Court, 3 pounds of methamphetamine street value

8     is over $130,000.  So we're not talking about anything on a

9     small scale.

10         The allegations of the attempted murder as the, as the

11    Court has explained, explained to the witness, the allegations

12    are severe.  They are -- this was a brutal beating that the

13    defendant personally participated in.

14         I guess the argument of defense counsel is that he

15    wasn't a leader of this act of violence; that there was someone

16    else who actually led the charge.  But regardless of whether he

17    was a leader of this particular act of violence, we submit that

18    he was, he personally participated in the brutal beating of

19    several, several members of this club and left them to die in a

20    desert.  So any, any suggestion that the defense counsel is

21    making also about, you know, the fact that the prior criminal

22    history of these victims somehow mitigates the culpability of

23    this defendant, that lacks any merit.

24         The defendant in this case personally participated,

25    and it's alleged that they participated to protect their

1    illegal enterprise.  That was the reason that they -- he

2    participated in this brutal beating.  And he was acting to

3    prevent an open war with another outlaw motorcycle club.  And

4    that's something we proffer in our response.  This was not

5    self-defense.  This was pure vigilantism and also protecting an

6    illegal enterprise.

7           Your Honor, we have evidence that, from eyewitnesses

8    to this event, and there's physical evidence that corroborates

9    it.  There's more than just one witness.  Their testimony

10   corroborates each other.

11          Defense counsel has been given an opportunity to

12   review the Jencks materials in this case, although they've not

13   been disclosed through discovery.  I also want to clarify that,

14   because she not just had an opportunity to meet and discuss,

15   but to actually review hundreds of pages of statements from

16   witnesses that implicate the defendant.

17          Your Honor, two points with respect to the flight

18   risk.  If the defendant is released, he is facing severe

19   penalties.  A mandatory ten years on the drug charge, up to

20   life imprisonment.  That provides him with a powerful incentive

21   to never return to Michigan and face these charges.  And let's

22   remember, the proposal for the third-party custodian is to be

23   released to someone who lives 2,500 miles from this courthouse.

24          The Devils Diciples Motorcycle Club, which it's been

25   established in the pretrial report and through these witnesses,

1    he is indeed a member.  That national network that the club has

2    provides this defendant with a national network of people who

3    could provide refuge to him if he decides to flee.  And also a

4    national network of people who can provide financial resources

5    to him if he decides to flee.

6              So given the powerful incentive, the severe penalties

7    to flee and the means to do so, we would ask that he also be

8    detained based on his flight risk.

9              Your Honor, just a couple other points I want to make.

10   In terms of the criminal history, just so we're clear, he does

11   not have a significant criminal history.  However, the Pretrial

12   Services report details a number of arrests and a pattern of

13   arrests:

14             1972, marijuana possession; 1979, receipt of stolen

15   property; 1981, assault with a deadly weapon; 1995, receipt of

16   stolen property and vehicle theft.

17             And although, it's not in the Pretrial Services

18   report, I would just like to make it known to the Court that in

19   the NCIC report, and I'll make sure that defense counsel,

20   defense counsel has had an opportunity to look at this as well,

21   there is a conviction for, in 1982, a misdemeanor fighting

22   charge.  So while I can see there's no significant criminal

23   history, there is a pattern of arrests and, and one conviction.

24             Your Honor, also when you look at the Pretrial

25   Services report, there is no verified employment history.  It

1    is, in fact, mentioned in the Pretrial Services report that the

2    defendant is on disability; that he's unable to work.

3            If you look at the witness or listen to the witnesses

4    and you look at those eviction notices, you also found out that

5    this defendant actually had unstable residences over a period

6    of time.  And the fact that he had an unstable residence, the

7    fact that he had no verified employment history, all of this

8    stuff goes to his flight risk as well, even if you have a

9    proposed third-party custodian.

10           So, your Honor, for all these reasons, I would ask the

11   Court to continue to detain this defendant, both on, both

12   because of his danger to the community and because of flight

13   risk.

14           THE COURT:  He seems to have a reasonably nice family,

15   though, true?

16           MR. MAIATICO:  I believe that's true, yes.

17           THE COURT:  Does that have any bearing on the analysis

18   that you're aware of?

19           MR. MAIATICO:  I think it does, your Honor, on the

20   flight risk analysis.  Because I think that, you know, when you

21   look at the community ties, the support he has of the family,

22   there's certainly, you know, something that shows, to a degree,

23   that he may not be a flight risk.  But I don't think that

24   speaks at all to his danger to the community.

25           And as I said before, the reason is he's had this

1    support of his family, even if it's been limited contact in

2    person, he's had this support.  And yet, it's alleged he's been

3    involved in ongoing large-scale drug trafficking and these acts

4    of violence, even despite his family ties.

5            THE COURT:  All right.  Thank you, Counsel.

6            My view in terms of family ties and the pleasant

7    things that I've heard from the son and the brother here about

8    family relationships, well, not all of them are pleasant, I

9    guess.  There are some turmoil and difficulty and evictions and

10   instability and so forth that they spoke of with respect to

11   this defendant's background and living arrangements.

12           But the proposal, first and foremost, of what is known

13   as third-party custodian or allowing a lien to be placed on a

14   person's residence that's free and clear of other incumbrances

15   and so on, puts the Court in a, in my view, untenable,

16   inappropriately awkward position, such that if a defendant,

17   such as this one were to be released on the strength of a lien

18   against a personal residence, the Court -- and the defendant

19   decides to be somewhere else other than court when he is called

20   upon to appear, the Court is put in a position then of

21   foreclosing on the lien, monetizing the arrangement and putting

22   out on the street an entirely pleasant family member, and his,

23   presumably his wife who is undergoing medical treatment at the

24   Berkeley Medical Center, for some apparently fairly extended

25   basis, given that a home was actually purchased in Berkeley,

1     the least expensive home in Berkeley, he said.

2            So the defendant suggests that the Court put itself in

3     the position of something like Simon Legree in the event that

4     trouble ensues here, and to take from the defendant's brother

5     and other extended family members the home that's been put up

6     as security.  That is a situation that, in my view, is entirely

7     unsatisfactory.

8            And I do not know from the testimony the true nature

9     of the relationship of these, these other family members, who

10    appear to be largely well-educated, financially successful with

11    multiple degrees and professional accommodations and so forth,

12    as contrasted with this defendant who sits in the desert

13    repainting fiberglass hot tubs, occasionally, and selling them.

14           I suspect that a brother with a degree, a business

15    degree from Harvard does not list his younger brother's Devils

16    Diciples Motorcycle Club affiliation as a reference on his

17    curriculum vitae.

18           I understand, though, that family ties and affection

19    and so forth, it's naturally felt.  But I am not persuaded that

20    anything I've heard today is either new or different compared

21    to what was presented to the magistrate, focused on likely the

22    flight, ties to the community and so forth.

23           In my view, frankly, the defendant's background is not

24    exactly nomadic, but also not particularly stable, speaks more

25    loudly than, and more persuasive than the testimony in the

1    forward-looking promises of monitoring and custodianship and

2    things of that sort.

3           The defendant here is obligated to show that new

4    information exists that was unknown at the time of the original

5    hearing, that is, the California hearing, and that new

6    information has a material bearing on the idea of whether there

7    are conditions of release that will reasonably assure

8    Defendant's appearance and reasonably assure the safety of the

9    community.

10          I don't, I don't detect new information.  I mean,

11   there's testimony now that elaborates on information that was

12   originally provided, but the defendant's living arrangements

13   and family ties were known at the time of the original hearing.

14   Perhaps there wasn't a proffer of third-party custodianship and

15   the offer of putting one's personal residence at risk, but

16   those are factors that I think are, in any event, minimally

17   persuasive.

18          The new information has to be legally adequate to meet

19   the statutory threshold and sufficiently material on the issue

20   of dangerousness, citing, for example, *United States vs.*

21   *Sandals, 9 F. App'x 377, 379, Sixth Circuit, 2001*.

22          As I have said in earlier orders on this and other

23   cases, the information should be something unexpected that has

24   truly changed the circumstances, something other than the

25   defendant's own opinion or some fresh evaluation of his

1     character for dangerousness and so forth.  I do not find a

2     demonstration of new circumstances that would justify release

3     on bond.

4          Similarly, with respect to the defendant's alternative

5     view that the Fifth Amendment has been violated with respect to

6     pretrial detention at this point, the *Bell vs. Wolfish*, *411*

7     *U.S. 520, 1979* established that pretrial detention can violate

8     the Fifth Amendment and does violate it when it amounts to

9     punishment, pretrial punishment of a detainee without

10    conviction.  There are four factors to be considered:

11         The length of detention; the extent of the

12    prosecution's responsibility for the delay; the gravity of the

13    charges; and strength of the evidence on which the detention is

14    based.

15         The length of the detention here is sufficient to give

16    rise to a, I'm not sure if it's called presumption, but it's

17    something of concern.  It is a lengthy detention, the Court

18    recognizes that certainly.  It's some 22 months I think,

19    something like that, Ms. Stout?

20         MS. STOUT:  That sounds about right.

21         THE COURT:  Twenty-one months, 22 months.  It's, it's

22    not insignificant, certainly.  But the prosecution bears no,

23    virtually no responsibility for the length of delay.  The

24    Government has not sought delays, has not in any way, to my

25    knowledge, dragged its feet.

         The gravity of the charges are substantial.  Obviously
it's a presumption case, presumption of detention, that is.
The allegations are, are as I put it to the brother in my
question, inflammatory.  They are absolutely.  And they are
not, they are not flimsy allegations or baseless allegations or
based upon mere hearsay or so forth.

         These are allegations which, on the evidence I've
reviewed are, are, appear to be borne out by evidence of
substance and are indicative of serious criminal activity and
conspiratorial activity, organizational activity on the
defendant's part, which weighs heavily on the Court's mind with
respect to dangerousness.  And that is as to the strength, both
gravity of the charges and strength of the evidence on which
detention is based, the third and fourth, *Bell vs. Wolfish*
factors.

         It's my view that the length of the pretrial detention
does not outweigh the other three factors here, all of which
weigh against a finding of a Constitutional violation.  It's my
view that the claim of Fifth Amendment violation, the motion to
dismiss that depends upon a Fifth Amendment violation claim is
not well taken.

         Similarly, with respect to a Sixth Amendment violation
claim for similar reasons, again, we focus on factors here as
taught by the Supreme Court, now in *Barker vs. Wingo*, *407 U.S.*
*514, 1972.*

1         The factors with respect to the Sixth Amendment

2   violation claim are the length of the delay, the reason for the

3   delay, the defendant's assertion of the right to a speedier

4   trial, and prejudice to the defendant.

5         Again, the length of the delay is essentially

6   presumptively prejudicial and the Court needs to examine the

7   other factors.

8         The second factor, however here, the reason for the

9   delay weighs I think in a favor of no Sixth Amendment

10  violation, because it is the complex nature of the, of the

11  allegations which derive from the complex nature of the alleged

12  organization that's at the core, the RICO organization that's

13  at the core of these allegations.

14        And the numerosity and breadth of the documents that

15  underpin the allegations or that illustrate them, and the

16  lengthy wiretap tapes, the Title III wiretaps, all of which

17  have been, that have been recorded, not transcribed to my

18  knowledge yet, but recorded for the benefit of defendants and

19  counsel to review, the documents have been digitized and

20  recorded and provided for the benefit of defendants and counsel

21  to review.  And there have been numerous requests for delay by

22  defendants, including this defendant or at least

23  acknowledgements of the need for additional time for review of

24  those extremely voluminous documents, hundreds of thousands of

25  pages indeed, in total, not all of them applying to each

1    defendant equally.  But counsel need, obviously have expressed

2    the need for time.  Ms. Stout has expressed a need for time to

3    review these things.

4           So I think that all of that bears upon the second

5    factor in a Sixth Amendment analysis.  And I recognize here as

6    well the Court has, at public expense, appointed a discovery

7    coordinator.  I've designated liaison counsel, of whom Ms.

8    Stout is one, speaking for, right?  Are you not liaison

9    counsel?

10          MS. STOUT:  I am the alternate, your Honor.

11          THE COURT:  An alternate liaison counsel.  I've

12   appointed four liaison, four alternates among the various

13   defendants here with groups of defendants represented here and

14   so forth.  We have periodic updates.  We hold both on and off

15   the record periodic updates in terms of discovery progress and

16   so forth.

17          The case is not, is not -- it's taking a very long

18   time certainly, but the case is not languishing by any means.

19   It is being attacked, I believe, thus far diligently by defense

20   counsel.  We do have a trial date impending, pretrial

21   conferences.  Change of plea opportunities and things of that

22   sort are, are soon upon us.  So all of that, I think, bears

23   upon the second *Barker* factor, and weighs in favor of a finding

24   of no Sixth Amendment violation.

25          The third *Barker* factor examines the defendant's own

1    responsibility to assert his right to a speedy trial, and that

2    the failure to do so weighs against a finding of a violation.

3              Here, I think the record reveals that the defendant

4    either requested a delay in the first instance, or at least

5    acquiesced in his counsel's statement of the need for

6    additional time.  And I believe that happened twice, at least,

7    on this defendant's docket.  And he has more recently, through

8    the presentation of these motions, begun to object.  I

9    understand that, object to the delay.  But it seems to me that

10   we're near the end of period of delay and approaching a period

11   of trial preparation and the hearings and so forth that lead to

12   trial.  We have motions, other motions pending by other

13   defendants.  They need to be resolved.  And I am working

14   through them as rapidly as reasonably can be done.  I do not

15   think that the third *Barker* factor weighs in favor of a finding

16   of a Sixth Amendment violation.

17             The fourth factors examines prejudice to a defendant.

18   And the interests to be examined here include the essence of

19   incarceration, the oppressiveness of, inherent oppressiveness

20   of pretrial incarceration.

21             The Court examines whether there are means taken to

22   minimize anxiety and concern the accused, but most important,

23   to limit the possibility that the defense will be actually

24   prejudiced.  And I don't find any verifiable allegation of

25   actual prejudice to the defendant here.  We're not -- I have no

1    claims of the loss of opportunity to examine evidence or the

2    loss of opportunity to identify witnesses, the loss of an

3    opportunity to prepare one's case with one's counsel and so

4    forth.  That last factor is most serious.

5           The defendant here, again, does not articulate any

6    particular way that the defense has been or may be impaired.

7    And, therefore, I do not find the fourth factor weighing in

8    favor of any finding of Sixth Amendment violation.

9           The Court has, and intends to continue to closely

10   monitor the progress of the case.  The proposition of delay, a

11   warranted delay for the examination of Rule 16 materials and

12   other investigatory materials that are being provided on a,

13   nearly an open file basis, but with protective orders, that is

14   with except, except for Jencks Act material.  But even here,

15   I've heard that Jencks Act material has, with respect to this

16   defendant has been provided, and perhaps so with other cases as

17   well.

18          The Government is really doing more than really is

19   obligatory, with respect to providing access to what we think

20   of as discovery materials here.  And it takes time to read

21   these things, as Ms. Stout herself has said on the record on

22   other occasions, and other counsel have nearly unanimously

23   agreed on that proposition.

24          So the absence of prejudice, in fact, moving more

25   rapidly toward trial would pretty likely produce prejudice,

1   because of the inability of counsel to, to intelligently

2   prepare a defense and being essentially surprised by the

3   Government's encyclopedic knowledge, I presume, of its own

4   investigatory materials and the relative, relative lack of an

5   opportunity for the defense counsel to have learned them as

6   well.

7           Being pressed, pushed to trial more rapidly than is

8   now occurring is actually probably more likely to produce

9   prejudice than a continue to delay anymore deliberate progress

10  towards, towards a trial environment.

11          So for all those reasons, the Sixth Amendment

12  violation claim is rejected as well.  And I'm going to maintain

13  the status as originally determined.  The motion for revocation

14  of the detention order accordingly is denied.  And I'll make a

15  brief notation on the record of the Court's findings in that

16  regard.

17          Is there anything else that needs to be considered for

18  the record, Ms. Stout?

19          MS. STOUT:  No, your Honor.  Thank you.

20          THE COURT:  Thank you.

21          Anything else, Mr. Maiatico?

22          MR. MAIATICO:  Nothing further from the Government.

23          THE COURT:  All right.  We will recess briefly while

24  the defendant is taken down and Mr. Castano is brought up and

25  then we'll resume.

1          Thank you.

2          THE CLERK:  All rise.  Court is now in recess.

3          (Proceedings adjourned at 11:31 a.m.)

4                    *        *        *

5

6                **CERTIFICATE OF REPORTER**

7          As an official court reporter for the United States

8    District Court, appointed pursuant to provisions of Title 28,

9    United States Code, Section 753, I do hereby certify that the

10   foregoing is a correct transcript of the proceedings in the

11   above-entitled cause on the date hereinbefore set forth.

12

13

14              s/ Christin E. Russell

15         CHRISTIN E. RUSSELL, RMR, CRR, FCRR, CSR

16            Federal Official Court Reporter

17

18

19

20

21

22

23

24

25